IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-CV-22145/KING

MARK E. HAGER, et al.,

      Plaintiffs,

vs.

LIVE NATION MOTOR SPORTS, INC.,

      Defendant.

_____/

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (DE #34). A Response (DE #40) and Reply (DE #42) have been filed, and the Court heard oral arguments[1] from both parties on September 24, 2009 (DE #44). After careful consideration and for the reasons stated below, the Court determines that the Motion for Summary Judgment should be **DENIED.**

I.    **Factual Background**

Mark Hager is a stunt driver. He was performing a car stunt at Dolphins Stadium where he was supposed to drive up a ramp, do a spiral jump, and land on other catch cars. However, there was a dip in the dirt right in front of the ramp, which caused him to lose speed, and his car fell short of the catch cars. He was severely injured. He claims that the Live Nation crew was grossly negligent in failing to ensure that the ramp approach was properly smoothed, thus causing his injuries.

---

[1] At the conclusion of oral arguments the Court discussed its reasoning and tentative conclusion, and requested counsel to submit a draft Order. The Court decided to dictate its own Order and has so notified counsel. The requested drafts have not been received, nor are they needed.

Live Nation is a company that produces and puts on shows and "thrill acts" that involve monster trucks and stunt driving. They organize the event and build the track and ramps to the performers' specifications. Mark Hager has performed in Live Nation shows many times doing car stunts, including the same "spiral jump" stunt he performed the night of the crash.

Hager entered into an agreement with Live Nation to perform the spiral jump stunt in a Live Nation show at Dolphins Stadium, as part of a larger show that included several acts. The agreement provided that Live Nation would pay Hager $11,000. The parties also executed a release agreement wherein Hager released Live Nation from any liability for negligence in connection with the event.

The parties submitted two videos in support of their filings. One video is of the crash itself, which shows Hager's car speeding toward the ramp, hitting the dip, and then going up the ramp and landing short of the catch cars. The second video shows Hager having a conversation with Daniel Allen, Senior Director of Operations for Live Nation, before the show. In that conversation, Allen acknowledges that there appears to be a dip just in front of the ramp that should be filled, and if it was not filled in it would slow Hager's car down and could result in a crash. On the video, Hager and Allen agree that the dip should be filled in with dirt before the show. Apparently, the dip was filled in properly before the show, and Hager did several practice runs where he drove over that area (but not up the ramp) and was satisfied with the speed he was achieving.

Lenny Fuller was the Live Nation employee in charge of overseeing the construction and maintenance of the track and ramp. He has roughly 30 years experience in this area, and has been working for Live Nation in this capacity for some time. At some point before or during the show, Fuller received the show schedule from Event Director James Moele. Moele was in charge

2

of the agenda and was the person in charge of keeping the show running on time and coordinating all the acts. When Fuller received the agenda, he saw that Hager was scheduled to perform his stunt after the monster truck rally and right before the intermission. Fuller knew that the monster trucks would tear up the dirt in front of the ramp and also knew that Hager's stunt required several of the catch cars to be moved right before the stunt. Thus, Fuller believed that he would not have sufficient time after the monster truck portion to fix the dirt approaching the ramp before Hager's stunt. He called Moele, expressed his concerns, and asked him to change Hager's stunt to after the intermission. Moele refused, saying the show would proceed as planned.

On the night of the show, the monster trucks disturbed the dirt in front of the ramp, exposing the dip, as Fuller expected. Right after the monster trucks finished their act, Fuller assigned two of his men to go and re-level the dirt approaching Hager's ramp. However, since several of the catch cars also had to be moved at that time, and Fuller believed that it was more important that the cars be moved correctly, he assigned his two most experienced men to move the cars, while he personally supervised the car moving. This left only two inexperienced men, whom he assigned to fix the dirt in front of the ramp. This they did. Fuller did not personally inspect the "dip," because he was supervising the car moving. He testified in deposition that in hindsight he should have inspected it.

Apparently, the dirt was not re-leveled properly, and the dip remained. Thus, when Hager attempted to perform his stunt, his car hit the dip, causing his car to lose speed and swing slightly to one side. Since he did not have enough speed to make it across to the catch cars, he landed short and was severely injured. He fractured several vertebrae, required months of

.

therapy, and has permanently lost sensation to several parts of his body. Hager has sued Live Nation for gross negligence, and Live Nation has moved for summary judgment.

## II.    Legal Standard for Summary Judgment

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the record as a whole could not lead a rational fact-finder to find for the nonmoving party, there is no genuine issue of fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that, to meet its burden, the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.").

On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See id.* at

4

252. If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50.

### III.   Defendant's Arguments for Summary Judgment

Plaintiffs' claim is that Defendant was grossly negligent when Daniel Allen and Lenny Fuller failed to properly maintain the approach to the ramp, knowing that Hager was relying on them to do so and knowing the consequences of failing to do so. Plaintiffs also claim that James Moele was grossly negligent in refusing to adjust the time schedule, knowing that there was not enough time to prepare the ramp approach before Hager's stunt.

Defendant has moved for summary judgment and makes two arguments: 1) Hager executed a release, agreeing not to hold Defendant liable for negligence, and 2) Defendant was not grossly negligent.

#### A.   The Contractual Release Argument

Plaintiff signed a release form in which he releases Live Nation from liability for any claim arising out of the stunt show, whether caused by negligence "or otherwise." Releases containing this language have been interpreted as including gross negligence, and are enforceable. *See Borden v. Phillips*, 752 So.2d 69, 73 (Fla. 1st DCA 2000). Plaintiff does not dispute this.

However, Plaintiff argues that a release which bars recovery for gross negligence in this situation is unenforceable because of Florida Statute § 549.09. That statute provides the following:

> Any person who operates a closed-course motorsport facility may require, as a condition of admission to any nonspectator part of such facility, the signing of a liability release form. The persons or entities owning, leasing, or operating the facility or sponsoring or sanctioning the motorsport event shall not be liable to a nonspectator or her or his heirs, representative, or assigns for negligence which proximately causes injury or property

damage to the nonspectator within a nonspectator area during the period of time covered by the release.

The statute defines "negligence" as follows:

'Negligence' means all forms of negligence, whether misfeasance or nonfeasance, and failure to warn against an existing or future dangerous condition, but does not include gross negligence, recklessness, or willful and wanton conduct.

Plaintiff argues that this statute means the operator of a motorsports facility cannot disclaim liability for gross negligence. Although indirect, that is in fact what the statute says. The statute allows motorsports facility operators to disclaim liability for negligence, but specifically exempts gross negligence from the definition of negligence. When the legislature expressly permits certain conduct, and then specifically excludes certain conduct from the definition of what is permitted, the legislature intends to prohibit the excluded conduct. Thus, the specific exclusion of gross negligence from the definition of what is permitted indicates that requiring a release from gross negligence is not permitted.

In response, Defendant argues that the statute, by its terms, does not apply to an event held at Dolphins Stadium. The statute applies to a "closed-court motorsport facility," which is defined as "a closed-course speedway or racetrack designed and intended for motor vehicle competition, exhibitions of speed, or other forms of recreation involving the use of motor vehicles, including motorcycles." Fla. Stat. § 549.09(1)(a). Defendant argues that Dolphins Stadium is not a closed-course motorsport facility, but rather a football and baseball stadium that was altered for the monster truck show on the day of the event. Defendant's interpretation would be an overly narrow reading of the statute. It would make little sense for the legislature to extend this protection to events held only at the several existing car racing facilities around the state, but withhold the same protection from the many events held at stadiums that are converted to

motorsports facilities. Rather, a more logical reading of the statute would be that Dolphins Stadium became "designed and intended for motor vehicle competition" when the promoters and crewmembers spent days before the event converting it for just such a use. Thus, the statute applies to the motorsport event in this case, and Defendant was not permitted to require a release for its alleged gross negligence.

### B.    The Gross Negligence Argument

Defendant argues that, even if the contractual release is not valid, Defendant was not grossly negligent. The parties agree on the standard for gross negligence: "To hold a party liable for gross negligence, the district court must find that the defendant had knowledge of the existence of circumstances which constitutes a 'clear and present danger' and yet still undertakes 'a conscious, voluntary act or omission ... which is likely to result in injury.'" *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000) (quoting *Sullivan v. Streeter*, 485 So. 2d 893, 895 (Fla. 4th DCA 1986)).

Defendant argues that, under any interpretation of the facts, Defendant's employees cannot be said to have undertaken a voluntary action likely to result in injury. However, in close cases, the question of whether conduct amounts to gross negligence is a question that should be left to the jury. *See Foy v. Fleming*, 168 So. 2d 177, 180 (Fla. 1st DCA 1964) (" 'In doubtful cases, the question of whether such negligence is ordinary or gross is, as we have heretofore held, one which under appropriate instructions should be submitted to the jury.' ") (quoting *Carraway v. Revell*, 116 So. 2d 16, 23 (Fla. 1959)); *Clearwater v. Thomas*, 446 So. 2d 1160, 1162 (Fla. 2d DCA 1984) ("The question remaining as to whether it was due care sufficient to negate gross negligence was a question for the trier of fact, and accordingly, summary judgment should have been denied."). Thus, summary judgment on this issue would not be appropriate.

## IV.    Conclusion

Accordingly, after careful consideration and the Court being otherwise fully advised, it is

**ORDERED, ADJUDGED, and DECREED** that Defendant's Motion for Summary Judgment

(DE #34) be, and the same is hereby **DENIED**.


**DONE and ORDERED** in Chambers, at Miami, Miami-Dade County, Florida, this 28th

day of September, 2009.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

**Cc:**
**Counsel for Plaintiff**
Don A. Russo
Don Russo
7990 Red Road
Miami , FL 33143
305-665-7171
Fax: 665-7146
Email: drusso@russopa.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Elizabeth Koebel Russo
Russo Appellate Firm
6101 SW 76th Street
Miami , FL 33143
305-666-4660
Fax: 666-4470
Email: ekr@russoappeals.com
ATTORNEY TO BE NOTICED

**Counsel for Defendant**
Phillips Richard & Rind
Gregory Morgen Cesarano
Carlton Fields
100 SE 2nd Street

Suite 4000 PO Box 019101
Miami , FL 33131-9101
305-530-0050
Fax: 530-0055
Email: gcesarano@carltonfields.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Cristina Alonso
Carlton Fields
100 SE 2nd Street
Suite 4000 PO Box 019101
Miami , FL 33131-9101
305-530-0050
Fax: 530-0055
Email: calonso@carltonfields.com
ATTORNEY TO BE NOTICED

Olga M. Vieira
Carlton Fields
100 SE 2nd Street
Suite 4000 PO Box 019101
Miami , FL 33131-9101
305-530-0050
Fax: 305-530-0055
Email: ovieira@carltonfields.com
ATTORNEY TO BE NOTICED